Good morning, Your Honors. May it please the Court, my name is John Malgren on behalf of Appellants K.S. Wild. I intend to reserve some time for a moment. I have three main points about the 60-day notice letter under the Endangered Species Act that is at issue in this case. First, the Endangered Species Act citizen suit provision requires 60 days notice of an alleged violation of the Act. Here, the notice letter surpasses that requirement. Second, the notice must allow the defendant to identify and attempt to abate the alleged violation. Here, the record proves that the Forest Service was able to do so. And third, it is undisputed that the parties undertook constructive attempts to resolve their dispute before K.S. Wild filed suit. In other words, based on the notice, the 60-day litigation-free window worked. Mr. Malgren, your briefing and the analysis below focuses on the, I think it's the July letter, correct? Correct, the June letter. The June letter, thank you. I'm curious in this case, and maybe there's a good reason for it. The October notice, the amended notice, if you will, seems to be very specific. It seems to identify the leases at issue. You amended the complaint 60 days, more than 60 days after the October notice. The court of auditors amended the complaint. Why isn't that disposed in this case? I don't believe that disposes this case because the other favor. Then, yes, it does dispose in this case. The October letter was a part of the litigation-free window where K.S. Wild was attempting to settle the case with the Forest Service, to get the Forest Service to abate the alleged violations. So in your view, it wasn't a notice in terms of the act? It seems kind of strange because they had more than 60 days' notice of the precise things you were complaining about with identification of leases. The complaint was amended to correspond with that notice. It would seem to me, though, that that almost perfectly covers the purposes of the act. I understand you're already in litigation, but I don't believe it. In other words, if you had dismissed the case on the day before the October notice, filed the October notice, and then refiled the case 60 days later, we wouldn't be here, right? I think that's correct, Your Honor, and I hesitate to make the Forest Service's argument for it, but I think what the Forest Service would ask them, they can make it themselves. I'm just asking why you weren't arguing it. Well, to hear you dismiss it, start another lawsuit. That's not an argument you want to make right now. But if we actually upheld the district court in this case, assuming there are still violations going on, you'd just do what you did all over again, right? We could, Your Honor. We would have to submit a new 60-day notice letter and then file a new lawsuit. I get you. Okay. What was the problem with the amendment? I'm not sure I understand. The amendment of the complaint? The request to amend it. There was no request to amend that was denied. Excuse me, Your Honor. The district court did refuse to allow plaintiffs to amend their complaint because he said that amendment of the complaint would be futile. However, K.S. Wild believes that it could have amended the complaint to eliminate any of the responses that were at issue in this case, to eliminate them from the complaint. So only the specific allegations that the forest service believed pertained to critical habitat for wild cocos. Why is that an amendment issue? That's why I'm having some difficulty with the district court's decision. Let's assume that you appropriately identified some number of leases, but not all the ones in your complaint. Why is the complaint dismissed then, as opposed to just the claims about the incorrectly litigated ones thrown out? Why is the complaint dismissed as a whole? You're arguing in terms that we should have allowed us to amend, to weed out what the district judge had determined were not the appropriate ones. But I can't find any case law that says that a notice that's good in part and bad in part, I identify four places, and every place else in the world is the next part, that the judge just doesn't dismiss the every place else in the world part and keeps the good parts. How did that occur here? Well, that's exactly why we are here, Your Honor. We believe, just to be clear, the amendment issue is an issue of last resort for K.S. Wild. We believe that the allegations in the notice letter that were also in the amended complaint were sufficient for the lower court to have jurisdiction to hear the merits of the case. Well, let's assume that the court was correct in assuming that the six locations not identified in your notice letter weren't sufficiently noticed, something you could negotiate about with the other side. Let's assume for a moment that the judge was correct in that. What's the appropriate remedy? Is it dismissal of the entire complaint or dismissal of those six allegations? I think it would be dismissal of those six allegations, Your Honor. All the other allegations that are at issue in this case correspond to dates that were in the notice letter. And importantly, I think it's also important to remember the Supreme Court's decision in Waltney, which is very clear that the allegations in a notice letter need only be allegations and need not be proven until the summary judgment stage of litigation. So you might have identified the wrong place. You'll lose on it, but it's sufficient notice. Exactly. And the notice letter itself is sufficient, and then it would be the burden of K.S. Wilde on summary judgment after the filing of an answer, an administrative record, discovery, and complete briefing to prove that those responses, which it is undisputed that those are final agency actions subject to judicial review under this court's en banc decision in the Krupp Tribe. But it would be the burden of K.S. Wilde to prove that they were in critical habitat. It would be the burden of the Forest Service to raise questions as to whether they were actually in critical habitat. I'm going to be trying to match up numbers in this case without much success. It's probably my fault. As I understand it, the response of the Forest Service was that there are, on the dates that you identified, or at least the record indicates, on the dates you identified in the June notice, in that time period, there were 30 NOIs. Approximately, Your Honor. Thirty. And you ended up, and it turns out that 24 of them were the ones that you ended up litigating about because, so am I right about that? Yes, Your Honor. So tell me how many, were there any duplicates on the days that you identified? In other words, were there more than one NOI on the dates that you identified? So, yes, Your Honor. On four of the dates, four of the 14 dates, there were multiple responses that corresponded to that date. However, for the remaining ten dates, there was only one response. And as I understand it, when you finally got to the complaint stage, you ended up not complaining about some of the dates in the original June. Am I right? That's correct. During that litigation-free window, KSY did learn additional information about what some of the operations actually entailed and where they were located. That's the part where I got lost. So this is, thank you for walking me down the road. By the time we get to the complaint, are the leases that are identified, is there more than one lease on any date that you're complaining about? In the amended complaint, there are, Your Honor. There are, for the dates, there are multiple responses on that specific date. And are you complaining about each of the responses? Yes. Okay. But to be clear, KS Wild also asserts that it was a general allegation in the notice letter, a simple statement, and I'm paraphrasing here, but that every time the Forest Service authorizes suction-dredged placer mining in critical habitat for wild coho salmon without first consulting with the National Marine Fishery Service, that that in and of itself is a violation of the Endangered Species Act. And are you contending, and this takes us off into slightly different territory from where we have been so far, are you contending that that general notice, that is to say every NOI that you issued with respect to these waters where there are or may be endangered or threatened species present, that's a violation, you're contending that that's notice as to every one of those NOIs that's authorized? Correct, Your Honor. And that should be sufficient, Your Honor. And why is that so? Is it because they're sufficient, that the numbers of these permission letters are small enough that it's not an undue burden on the Forest Service to ask them to go through it and look at your file? That's correct, Your Honor. I don't believe the place is an undue burden, and the Forest Service certainly should know because it has a requirement. Well, it's always kept a file of them, and the response from Mr. Reporter shows that they looked at their file. Indeed, and as part of the record also, Your Honor, KSWILE did submit a Freedom of Information Act request and was able to obtain some of these responses as it was investigating the merits of this litigation. And so the Forest Service had already compiled all of these responses, so it had all this information together in one place. Do we know, based on the record that I'm allowed to look at, do we know how many total responses there were, not just the responses that you referenced in your initial letter, but do we know the total number of responses by the Forest Service during the relevant period? No, Your Honor, we do not. Okay. I say that now and must again. If the relevant period is the first date in your June letter and the last date in your June letter, I know you're seeking to expand it beyond that. We know that the total number of responses was 30. Right. Correct. What we don't know is if we extend it beyond that, how many files they would have had to look at. That's true, Your Honor. It could have been thousands. It could have been two. That's correct. But does it matter? I don't believe it does matter, Your Honor. Here, at a minimum, these, you know, approximately 30 dates are at issue, and we know exactly how many. But you're claiming more. You're claiming that every time they entered into a case, they responded to an NOI. I guess they call it an NOIR. And every time they did something dark here, you covered that by your letter. So we're asserting that for the purposes of sufficiency of notice, that general allegation is sufficient. However, for the purposes of judicial review, it does need to get into the level of specificity of the individual responses. Right. But we only talked about notice here. Correct. So why shouldn't it matter? Let's assume that the Foreign Service had issued 10,000 of these outside the period of the dates in your June letter, and they said, gee, we'd like you to be more specific. Some of them were issued during the climate, but some of them were far away from any place you're complaining about. Give us more information. Wouldn't that have been a reasonable request? In other words, I'm not sure how good a notice it is may well depend on how many of these there are, isn't it? That could be, Your Honor. But, unfortunately, we don't have that information. It's not in front of us. That's correct. And it may or may not be on the record. My impression is that the permissions given by the Forest Service to do the section of dredge mining pursuant to the NOI are year by year. That is to say, you don't get a permission that goes for the next 10 years. You get it for this, quote, season. Is that correct? Or do we know that from the record? I don't believe that is correct, Your Honor. As this Court pointed out in the Ombank group tribe decision, the Forest Service regulations at issue do not put an end date on the responses or authorizations. Well, I'm after what the practice of the Forest Service was, irrespective of the regulation. So only one of the responses is in the record, which T.S. Wild submitted with their reply brief and asked this Court to take judicial notice of. And in that response, it is clear that there is no end date to the authorization. And even if the Forest Service does assert the whole concluded mining operations argument, but it is the authorization, not the actual mining, that triggers the Section 7 obligation. Have we taken you down to about two minutes? Shall we have the other side respond after that? Thank you, Your Honor. Thank you, Your Honors, and may it please the Court. My name is Lee McFadden. I represent the Forest Service and federal FLEs in this case. In June 2012, this Court made clear that the Forest Service has to engage in ESA Section 7 consultation when it receives a notice of intent to mine critical habitat or in areas of the natural forest that may affect a leasted species. Eleven days later, it received a letter from T.S. Wild indicating its intent to sue on that very same claim. The Forest Supervisor wrote back sometime later to say, We've done our best to identify which of the claims you might be referring to on these dates. We found 30. A lot of these don't appear to us to be ESA violations. Maybe this one is. Clearly an indication that what more was needed in the Forest Supervisor's letter was some specificity about the claim, where the claim was, what it was called, a name. Any of these identifying characteristics make it easy to find the mining claimant question. Let me go back to the question I asked your opponent. You got that letter. It covered a window of time. Leases entered into on the following day. Well, it covered 26 specific dates. It didn't say every date in between. Put aside the everything else in the wolf part of the letter for a second. On those 26 specific dates, you had the Forest Service had entered into 30 NOIs. That's what the Forest Supervisor found, yes. So that's what the record indicates. They may have had terrible claims as to a bunch of those leases, but why wasn't that sufficient notice to start, which is all that the statute requires to allow you to go back and consult with them and negotiate? Because the case law on what constitutes sufficient notice speaks repeatedly about the purpose of these notice provisions that are a prominent feature not just of the Endangered Species Act, but the Clean Water Act, the Clean Air Act, all these major federal environmental statutes, are designed to prevent litigation when at all possible by giving the federal agency a chance to correct its course of action before the lawsuit is filed. So you know there were 30 leases at issue, and the question in each of those was whether or not you would correctly give a response to them that said go ahead without submitting a plan of operations. Why wasn't that? It certainly gave you the opportunity to evaluate their claims, talk to them about them, tell them they were silly, tell them that there was one or more that you wanted to talk about. So what was lacking in that first notice? Well, the force supervisor's letter indicates what was lacking. We're not sure if these are the claims. Then we had a meeting at which there was further discussion, and then we received another letter which identified different claims. Right, so put aside the one that identified different ones. So we never knew. Your opponent, for some reason, isn't pursuing that one. So I want to know, with respect to those, you knew there were 30. You knew precisely what their claim was, that you should have not given a response without asking for a plan of operations because they were engaging in certain type of operations. What was missing? Some of them turned out to be terrible claims, but that's the merits. Well, but that also goes to how the force can correct its course of action. It has 60 days to initiate consultation if it's required. But the purpose of the notice requirement is to allow you to know what they're complaining about. And they give you very specific dates. And I'm assuming that the Forest Service maintains a chronological file of letters that it sent out. Turns out that's right because Mr. McWhorter's response says, well, we've gone through and we found all these things. And once they've gone through and they've found them, it's very clear from Mr. McWhorter's letter, they know exactly the name of the particular applicant, the proposal under the NOI. So once armed with the dates and the letters, he goes into the file and he finds them. So what's the problem? Well, this could have been solved in any number of ways. Case 1 could have written back to say, you're right, those are the 30. Now let's talk about those 30 and try to negotiate a resolution about those 30. It could have written back and said, you're wrong, here are the ones we have in mind. It obviously objected to the way that the forest views the location of critical habitat. It could have said, yeah, but that's fighting about the marriage. I mean, once you get the notice of the initial letter that says, we're interested in those that we've shot on the following dates, I think you're on notice that, okay, let me go back and look what I did on those dates. What's the problem with that notice? Well, the problem was it turned out we were wrong about some of those. There were multiple notices on some of those dates that weren't identified in the initial response, the one that was simply 30. But it's actually a response, not the notice. The notice says, I'm complaining about the leases entered into on these specific dates, the NOIs issued on these specific dates. I see them fight about whether or not you guys are in compliance, but if he gives you the dates on which the letters are sent out, the universe is very confined. You look at everything that's been sent out on those very precise dates, and, okay, let's go, which is, you must have a quarter of them dead. Well, right, but even though the universe is finite, they're actually not maintained chronologically. So there was, it's not in your record, of course, but there was a much larger file to go through. They managed to do something in response, and I think the appropriate response from K.S. Wilde would have said, okay, now we see what the problem is. The letter clearly says we need to know mining claims or names or some other identifying characteristics, know which ones we're dealing with, and K.S. Wilde could have provided that, indeed did later provide just that. That's a defect in the negotiations, perhaps. But in terms of the notice, is your problem is that their notice was over-inclusive? The problem is that the notice, well. It was certainly specific. To the extent. Any NOI entered into on this precise date is the one I'm complaining about. To the extent. Some of them they shouldn't have complained about. Right. I am complaining about its over-inclusivity as, you know, to the extent that it is now being defended as a challenge to all responses. And again. But smaller than that. I want to mentalize my answer. Right. I mean, it could have just identified one mining claim to which they objected. They have been, as they said, they had received these responses prior to filing their letter. They had before them. They could have done them. Maybe they were irresponsible. Maybe they complained about much too much. And there wasn't much to complain about. But that's not a notice issue. That is a notice issue, Your Honor. Because that is a responsibility in the sense where each of these is a discrete agency action. They're not all the same. Each mining operation has to be evaluated differently. And each potential ESA violation at a mining location has to be resolved differently. But this is a notice issue. They notified you about each of the several ones. It may take a long time to negotiate. But why is the notice, why is it over-inclusive? Let's assume it was very specific. Let's assume that the first notice included the exact lease numbers that their later notice had. It would have been over-inclusive, perhaps. But why would it have been an insufficient notice? A notice that had specific ‑‑ I'm sorry, they're not leases, Your Honor. We'll call them mining operations. But a notice that identified a specific plain number or miner's name or precise location, that would have been a sufficient notice. It would not have been difficult to satisfy the notice requirement in this case. It is not an onerous burden on the plaintiffs. But it is a ‑‑ How onerous a burden is it on you to pull all the letters that were sent out on those specified dates? It's onerous because it is not required of the Forest Service. It was ‑‑ That's not my question. You said it's not onerous on them, and I think you were talking about a practical matter. I'm now asking how onerous was it on you when I'm talking about a practical matter. It was onerous for the following reasons. First of all, they're not maintained chronologically, so someone had to spend a great deal of time going through it. But more importantly, to answer your question. Wait a minute. The Forest Service does not maintain a chronological file of letters sent out from the Forest Service, for the particular forest. There's a searchable database by name and claim number. I'll say you've got to plug it into the computer that spits it out automatically. You print it all out, you look at the date on the top, and then you see if it matches that. So far, that doesn't sound very onerous. No more onerous than their burden. The reason it's onerous is because the ‑‑ But on the other hand, to get the information that you say they should have provided, they needed to get their hands on all of those letters, right? Right. So they do a Freedom of Information Act request from you. You have to go through the onerous stuff of complying with that. Once you've done that onerous work, then they can do it. But you've already done the work you complained you didn't have to do. I don't get it. Well, we had compiled them all and sent them to them, which is a little bit different work. This is not about how hard it was for the Forest Service staff person to actually do this paperwork. This is about how hard it was for the Forest Service to recognize what the alleged violations were with enough specificity they could solve it. But the letter is quite clear about what the alleged violations are. Again, it may be a terrible claim, but the letter is quite clear. The letter says the violation is that allowing these operations without requiring a plan of operation to be submitted and making it an OIR without doing more. Which is ‑‑ the letter is quite specific. What is not very specific about is the particular locations. But so far as I can tell, that was a piece of cake for either side. They could have done a Freedom of Information Act request first, had you identify all the locations done on those days, and then said, okay, we complain about all of them. Or they could say to you, we're identifying the days and we're complaining about all of them. And either way, it was pretty simple to figure out the places. So I'm still struggling with why you didn't have sufficient notice. Well, look at Forest Service Officer's response. It says, we don't believe these are critical habitat. And there is a meeting. And there's a follow‑up letter that says, no, Forest Service. We interpret critical habitat designation differently. It's not drawn on a map. It's described by narrative criteria. There's obviously a dispute there. If they had said, you said these foremining claims aren't in critical habitat, but you're wrong, and in 60 days we're going to sue you about those, they could have done that. It's a valid lawsuit. There are many simple ways they could have solved this problem. I want to point out, though, that this whole lawsuit has now been overtaken by offense. I mean, the relief requested in the complaint is that the Forest Service not allow notice level mining without consultation, and that the Forest Service engage in consultation with NEMS over suction dredge mining and plaster mining critical habitat. All that is occurring, has been occurring since the mining season following the filing of the amended complaint. How do we deal with that? The district judge said, you haven't filed a sufficient notice, so I'm dismissing for absence of jurisdiction. Might dismiss if he had jurisdiction for any number of other reasons, but didn't. Don't we send it back to the district court for you to make that argument? To make that argument, yes. Yeah, the argument you're now making. Yes, but to make the alternative grounds for a firm that's presented in the briefs don't require we manage the district court. When the complaint was filed, the mining was over. They could wait until the next year to see if there was new mining, contrary to this court's opinion, in Crook Tribe. And if there was, they could have sued us. I just heard from your adversary that these approvals by the Forest Service are open-ended. They're not valid for one year and then have to be renewed. Is that correct? That is not correct, Your Honor. It is, as you pointed out, it is the practice of the Forest Service to take these notices annually and to respond to them on a seasonal basis. And do I know that from the record that's now in front of me? No, Your Honor. You don't have all of the responses. I'd like a better remand if that's going to be a malicious issue. It sounds like you can't determine it from the record because you guys are disagreeing on what the actual practice is. Right. Well, I mean, I can see there's been no judicial fact-finding on that question, so you could remand the district court for that. I can tell you now the conclusion will be that we're correct. That is how the practice happens. That is what these notice response letters say. And the case would be dismissed for failure of such a characteristic in the initial. But the record doesn't allow us to reach that point. I don't believe it does. Let me ask you a question. Ma'am, if you're happy to take judicial notice of the response letter they've submitted to you, which is a public record, which, by the way, is open-ended because it's not for work in-stream. It's not a response to suction dredge, notice of intent. We could submit the other notice of intent letter responses to you. You could look at them yourselves if you wanted to. If you read the record and answered the question, you could have it. That's why we have district courts. But let me ask you a question, and I want you to assume something that you don't want to assume. Let's assume that this notice sent out in June was sufficient as to some locations, 24, but not sufficient as to 6 that ended up in the complaint. If that were the case, shouldn't the district judge only have dismissed the 6 claims rather than the entire complaint? Yes, if that were the case. If that were the case. The district court correctly judged the notice letter itself was insufficient on its face, and that's why it dismissed the complaint in its entirety. And if the judge were right on that question, I think the judge is also right in saying no amendment, if the new amended complaint would be premised solely on that initial letter. That's right. That's the argument the other side didn't want to make for you. The case where the notice letter is partly good and partly bad is a different case than this one. The second one doesn't have the reasons, it just has the locations. That's right. But if the basic problem for the district judge is that initial notice letter was deficient, and if the amended complaint was only going to talk more about more things but still rely on that notice letter, I think the judge had a right not to allow the amendment because it would be relying on the same deficient letter. I got that. But that brings us back to the sufficiency of the notice. It does, yeah. This case is about whether it's sufficient in its entirety, and in this case it is not. All right. Unless the court has any more questions. Thank you very much. Thank you. Mr. Morris. Thank you, Your Honors. I think that the Forest Service's conduct after receipt of the June notice letter is illustrative of the fact that they were aware exactly what K.S. Wilde was alleging that they were doing in violation of Section 7 of the Endangered Species Act. Supervisor McWhorter admits that he found the letters in the file, but disputed whether or not they actually referred to operations in Sankoho Critical Habitat. However, that dispute over the validity of the allegations is not relevant to the determination as to whether or not the Forest Service was able to identify and abate the violations, which this court has held is the only standard by which to judge the sufficiency of the notice letter. In its briefing, the Forest Service attempts to conflate the requirements of the Clean Water Act, which have specific regulations that the EPA promulgated to elaborate on what sufficient notice actually means. However, there are no such regulations for the Endangered Species Act. So could you have filed a notice that said any NOIR that involves suction and dragging, period, would that have been sufficient notice? I think it would have also had to include the modifier that suction dredging in critical habitat for wild coho salmon. Why? Because you have to show the Forest Service what it's doing, what species it's harming. So would that have been a sufficient notice? Yes, and that's our primary argument, Your Honor, which is why it doesn't matter that there's perfect correlation, or that there isn't perfect correlation between the dates in the notice letter and the dates in the amended complaint. In order for you to win this appeal, do we have to accept that argument? No, Your Honor, you do not. Good. You can look to the dates, and as long as there is one date in the notice letter from June that correlates to a date in the amended complaint, that is sufficient for the sufficiency of notice. Thank you, Your Honors. Thank you. All sides for their House of Orders. The case of the Claremont-Siskiyou Wildlife and Wildlife Land Center v. Reporters submitted for decision.
judges: Walter, Fletcher, Hurwitz